STEPHEN T. KAM (Cal. Bar No. 327576)
Email: kams@sec.gov
ROBERT C. STILLWELL (Cal. Bar No. 308630)
Email: stillwellr@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Katharine E. Zoladz, Regional Director
Gary Y. Leung, Associate Regional Director
Douglas M. Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>FAT BRANDS INC., ANDREW WIEDERHORN, RON ROE, and REBECCA HERSHINGER,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**JURISDICTION AND VENUE**

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendants Andrew Wiederhorn, Ron Roe, and Rebecca Hershinger reside in this district, and Defendant FAT Brands Inc. has its principal place of business in this district.

**SUMMARY**

4.      Between October 2017 and March 2021 (the "Relevant Period"), Andrew Wiederhorn ("Wiederhorn"), the former chief executive officer and current director and controlling shareholder of FAT Brands Inc. ("FAT" or the "Company") used almost $27 million of FAT's cash on his personal expenses including private jets, first class airfare, luxury vacations, his rent and mortgage payments, shopping, and jewelry.  During this time, Wiederhorn falsely told the Company's auditors, board of directors, and investors that neither he nor his family members had any direct or indirect material interest in the FAT cash that Wiederhorn used for those personal expenditures.

1

5.      Between July 2018 and March 2021, Wiederhorn engaged in deceptive acts and made false and misleading statements to make it appear that the millions of dollars of FAT's money he was spending on himself and on his family each year were company loans to FAT's affiliate Fog Cutter Capital Group, Inc. ("FCCG"), another company that Wiederhorn controlled, for FCCG's business expenses. Wiederhorn used his control over FCCG to take the money that FCCG was receiving from FAT and spend it on himself.  Wiederhorn then misled FAT's board of directors (the "FAT Board") and the Company's auditors, leading them to believe that FCCG was using the proceeds from FAT's loans solely for FCCG's business expenses and pre-existing liabilities.

6.      Although this fraudulent scheme allowed Wiederhorn to hide from the FAT Board, the Company's auditors, and investors the fact that he was spending FAT's cash to fund his lavish lifestyle, it stripped FAT of approximately 40 percent of its revenue during the Relevant Period, often leaving the Company with insufficient cash to pay its own bills.  Between 2017 and 2019, Wiederhorn instructed his son to wire over $9 million into FAT, concealing that Wiederhorn used millions of FAT's funds for his own personal spending and that FAT was otherwise unable to pay its own bills.

7.      Wiederhorn enlisted the help of Ron Roe ("Roe"), the Company's former chief financial officer ("CFO") and current senior vice president ("SVP") of finance and executive officer to execute his scheme.  Roe used his position at the Company to send FAT funds to Wiederhorn, Wiederhorn's family, or Wiederhorn's creditors.  Both Roe and Rebecca Hershinger ("Hershinger"), another former CFO at FAT, personally signed, certified, and disseminated false and misleading statements that failed to properly disclose Wiederhorn's personal interest in these transactions.

8.      By engaging in this conduct:  (i) FAT violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), 13(k), and 14(a) of the Securities Exchange Act of 1934 ("Exchange

Act") and Rules 10b-5(b), 12b-20, 13a-1, 13a-13, 14a-3, and 14a-9 thereunder; (ii) Wiederhorn violated Sections 17(a)(1) and (3) of the Securities Act, Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-3 and 14a-9 thereunder; and aided and abetted FAT's primary violations of Section 17(a)(2) of the Securities Act, Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(k) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder; (iii) Roe violated Section 10(b) of the Exchange Act and Rules 10b-5(b), 13a-14, and 13b2-2 thereunder; aided and abetted Wiederhorn's primary violations of Sections 17(a)(1) and (3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder; and aided and abetted FAT's primary violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(k) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder; and (iv) Hershinger violated Section 10(b) of the Exchange Act and Rules 10b-5(b), 13a-14, and 13b2-2 thereunder; and aided and abetted FAT's primary violations of Section 17(a)(2) of the Securities Act and Sections 13(a), 13(b)(2)(A), 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder.

9.     The SEC requests that the Court impose permanent injunctions against each of the Defendants for their respective violations of the federal securities laws, and bar Wiederhorn, Roe, and Hershinger from acting as an officer or director of a public issuer pursuant to Section 21(d)(2) of the Exchange Act.  The SEC requests that the Court order FAT and Wiederhorn to disgorge their ill-gotten gains with prejudgment interest thereon.  The SEC requests that the Court assess civil money penalties against FAT, Wiederhorn, Roe, and Hershinger, pursuant to Sections 21(d)(3) of the Exchange Act and 20(d) of the Securities Act.

## **DEFENDANTS**

10.     **FAT Brands Inc.** is a Delaware corporation with its principal place of business in Beverly Hills, California.  FAT owns 17 restaurant brands, including Fatburger, Johnny Rockets, and Twin Peaks.  During the Relevant Period, FAT was a reporting company with its securities registered with the SEC pursuant to Section 12

of the Exchange Act.  During the Relevant Period, FAT filed annual Forms 10-K and quarterly Forms 10-Q.  During the Relevant Period, FAT conducted an offering pursuant to Regulation A in September 2019 and an offering pursuant to Form S-1 in July 2020.

11. **Andrew Wiederhorn**, age 58, is a resident of Beverly Hills, California. During the Relevant Period, Mr. Wiederhorn served as FAT's and FCCG's chief executive officers at all relevant times.  In 2004, Wiederhorn pleaded guilty to two federal felony criminal charges for paying an illegal gratuity and filing a false tax return.  Wiederhorn served 14 months in prison.

12. **Ron Roe**, age 46, is a resident of Los Angeles, California. Roe served as FAT's CFO from October 20, 2017 through August 16, 2018, and SVP of finance, from August 2018 through the present.

13. **Rebecca Hershinger**, age 50, is a resident of Los Angeles, California. Hershinger was FAT's CFO from August 16, 2018 through May 31, 2021.

### RELATED PARTIES

14. **Fog Cutter Capital Group, Inc.** was, until it merged with FAT on December 24, 2020, a Maryland corporation with a principal place of business in Oregon.  FCCG had been listed on NASDAQ until 2004, when it was delisted for conduct involving improper payments to Wiederhorn.  During the Relevant Period, Wiederhorn was FCCG's Chief Executive Officer and owned between 30 and 45 percent of its shares.  Wiederhorn and his family collectively owned about 60 percent of FCCG's shares during that same period, and FCCG, in turn, owned at least 80 percent of FAT's shares.

15. **Thayer Wiederhorn ("Thayer")**, age 35, is a resident of Los Angeles, California.  Thayer is currently Chief Operating Officer of FAT and was Chief Marketing Officer during the relevant period.  Thayer is Andrew Wiederhorn's son.

///

///

## THE ALLEGATIONS

**A.    Wiederhorn Created FCCG and Later Formed FAT as Its Subsidiary**

16.    Wiederhorn formed FCCG in 1998.

17.    In 2017, Wiederhorn formed FAT as a wholly owned subsidiary of FCCG, with FCCG owning 80 percent FAT's shares.

18.    During the Relevant Period, Wiederhorn held approximately 40 percent of FCCG's shares and served as the chief executive officer ("CEO") of both FAT and FCCG.

19.    Wiederhorn controlled both FAT and FCCG, including directing, authorizing and approving all wires, transfers and bill payments to and from both FAT's and FCCG's accounts.

20.    Wiederhorn's annual salary as CEO of FAT, according to the Company's public filings, was $400,000.

21.    On October 20, 2017, FAT conducted an initial public offering ("IPO"). Following the IPO, FAT was required to make certain disclosures in its SEC filings as a reporting company with securities registered with the SEC pursuant to Section 12 of the Exchange Act.

22.    At the time of the IPO, FCCG had just two revenue-generating businesses: the restaurant chains Fatburger North America, Inc. ("Fatburger") and Buffalo's Franchise Concepts, Inc. ("Buffalo").

23.    FCCG transferred ownership of Fatburger and Buffalo to FAT in connection with the IPO, leaving FCCG with essentially no revenue and no business operations.  FCCG continued to hold as an asset approximately $100 million in net operating losses that could be made available to FAT under certain conditions to reduce the Company's tax liabilities.

24.    In exchange for these two businesses, FAT issued a $30 million promissory note (the "FCCG Promissory Note") to FCCG.

25.     Ron Roe, the chief financial officer ("CFO") of FCCG, became the CFO of FAT in connection with the IPO and served in that position until August 2018. The cash management team that Roe oversaw at FCCG transferred to FAT in connection with the IPO.

26.     In August 2018, Hershinger took over as the CFO of FAT and served in that position until May 2021.

**B.      As a Reporting Company, FAT Was Required to Disclose Related Person Transactions**

27.     During the Relevant Period, Regulation S-K Items 404 (a) and (d) ("Item 404") required FAT, as a reporting company, to describe in certain SEC filings, including in the Company's Forms 10-K and proxy statements, any transaction, or series of similar transactions in which FAT was a participant and the amount involved exceeded $120,000, and in which any related person—including any director or executive officer of FAT and any immediate family member of a direct or executive officer—had or will have a direct or indirect material interest.  These transactions are commonly referred to as related person transactions.

28.     For any related person transactions, Item 404 required FAT in certain SEC filings to describe, among other things:  the name of the related person and the basis on which the person is a related person; the related person's interest in the transaction; the dollar amount involved in the transaction; the dollar value of the related person's interest in the transaction; and any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

**C.      Wiederhorn's Direct or Indirect Interest in Certain FAT Transactions**

29.     From October 2017 through December 2020, FAT's revenue was approximately $61 million.  During this time, Wiederhorn directed approximately $38 million in FAT transfers to FCCG.

30.     Between October 2017 and in or about July 2018, the majority of the funds that FAT transferred to FCCG were in repayment of the $30 million FCCG Promissory Note.  By July 2018, the remaining balance due under the note was less than $1 million, which FAT publicly reported it had fully paid back by September 2018.

31.     Wiederhorn, however, directed FAT to continue transferring millions of dollars to FCCG, even after the FCCG Promissory Note was fully paid back, through what the company disclosed as intercompany lending from FAT to FCCG.

32.     Wiederhorn had a direct or indirect material interest in the funds transferred to FCCG because he borrowed a substantial portion of those funds from FCCG and used those funds for his personal expenses, his family, and his personal creditors (the "Wiederhorn Personal Cash Transfers").

33.     From July 2018 through December 2020, FAT's revenue was approximately $51.5 million.  During this time, Wiederhorn directed FAT to loan approximately $28.3 million of FAT's funds to FCCG as intercompany loans, approximately $20 million of which he then used to fund Wiederhorn Personal Cash Transfers.

34.     The Wiederhorn Personal Cash Transfers were either direct transfers from FAT's company accounts to Wiederhorn's personal accounts, his family, or his creditors, or they were indirect transfers that first passed through FCCG's bank accounts before being sent to Wiederhorn's personal accounts, his family, or his creditors.

35.     In either case, the Wiederhorn Personal Cash Transfers benefitted Wiederhorn personally, not FAT or FCCG.  Wiederhorn used these transfers to pay off his personal credit cards.  These transfers included payments for private jets, first class airfare, luxury vacations, Wiederhorn's mortgage and rent payments, and nearly $700,000 in shopping and jewelry.

36.     Wiederhorn was responsible for directing the transfers from FAT that

funded Wiederhorn Personal Cash Transfers.  He required FAT's cash managers to prepare daily "cash reports" reflecting all of the funds in FAT's, FCCG's, and Wiederhorn's personal bank accounts, and met with the cash managers on an almost daily basis to direct them as to which of his, or his creditors', accounts the Wiederhorn Personal Cash Transfers should be sent, and whether the transfers should first pass through FCCG's accounts.  The FAT cash managers followed Wiederhorn's direction as to how much and to which accounts FAT would send money.

37.     From July 2018 through December 2020, the Wiederhorn Personal Cash Transfers were recorded by FAT as intercompany loans to FCCG, even when the funds were intended solely for Wiederhorn's personal use and even though, in many instances, the funds never even passed through FCCG's accounts.

38.     Between October 2017 and December 2020, the Wiederhorn Personal Cash Transfers were never disclosed as related party transactions to FAT investors in the Company's public filings.

39.     The Wiederhorn Personal Cash Transfers were never repaid and were written off by FCCG at Wiederhorn's discretion in 2020.

**D.     The Thayer Transactions Concealed FAT's Inability to Pay its Own Bills**

40.     In 2017, the Wiederhorn Personal Cash Transfers totaled approximately $1.1 million, which was approximately 50 percent of FAT's revenue during that year.

41.     In 2018, the Wiederhorn Personal Cash Transfers totaled approximately $9 million, which was approximately 49 percent of FAT's revenue during that year.

42.     In 2019, the Wiederhorn Personal Cash Transfers totaled more than $7 million, which was approximately 31 percent of FAT's revenue during that year.

43.     In 2020, the Wiederhorn Personal Cash Transfers totaled approximately $9.6 million, which was approximately 53 percent of FAT's revenue during that year.

44.     From October 2017 through December 2020, the Wiederhorn Personal Cash Transfers totaled approximately 44 percent of FAT's revenue over that

timeframe.

45.    The Wiederhorn Personal Cash Transfers stripped FAT of cash to pay its own bills.

46.    Therefore, Wiederhorn instructed his son Thayer to transfer millions of dollars in cash to FAT, because the Company's accounts were frequently short on cash and the Company was unable to pay its bills (the "Thayer Transactions"). To effectuate these transactions, Wiederhorn sent funds to Thayer's personal accounts using credit cards that were paid for by FAT. Thayer would then transfer the funds he received from Wiederhorn into specific FAT accounts as instructed by Wiederhorn.

47.    The Thayer Transactions were used when FAT needed cash to pay its bills and expenses, including, among other things, its payroll and concealed the fact that FAT was frequently short on cash.

48.    From 2017 through 2019, the Thayer Transactions amounted to over $9 million sent to FAT's bank accounts.

49.    In 2017, the Thayer Transactions totaled approximately $220,000, which was approximately 10 percent of FAT's revenue during that year.

50.    In 2018, the Thayer Transactions totaled approximately $5.5 million, which was approximately 30 percent of FAT's revenue during that year.

51.    In 2019, the Thayer Transactions totaled approximately $3.5 million, which was approximately 16 percent of FAT's revenue during that year.

52.    Wiederhorn directed the Thayer Transactions and directed the FAT cash management team on how the wires were to be accounted for in FAT's books.

53.    The Thayer Transactions were never publicly disclosed as related person transactions to the Company's investors.

**E.    Wiederhorn Concealed the Nature of the Wiederhorn Personal Cash Transfers and the Thayer Transactions**

54.    Wiederhorn concealed from FAT's Board that the purpose of the loans

from FAT to FCCG were to fund the Wiederhorn Personal Cash Transfers and to benefit himself personally.  Due to this concealment, and the control that Wiederhorn had over FAT as its CEO, he was able to carry out his fraudulent scheme for years.

55.    Wiederhorn misrepresented to FAT's Board that the loans from FAT to FCCG were for FCCG's business expenses.

56.    For example, in May 2019, Wiederhorn sent email communications to FAT's Board representing that the loans were "for FCCG to pay [its] various tax and legal settlements and other obligations."

57.    Similarly, in April 2020 emails with the FAT Board, Wiederhorn represented that "funds at [FCCG] are used to pay pre-existing pre-IPO liabilities." Wiederhorn made similar statements at FAT board meetings in April 2020, telling the FAT Board that the loans were used solely for FCCG's business expenses and concealing that they were primarily used for his personal benefit.

58.    In addition, for fiscal years 2018 through 2020, Wiederhorn completed annual director and officer questionnaires as the CEO of FAT that were submitted to the Company's auditors.  The stated purpose of the questionnaires, in pertinent part was to provide FAT:

> [W]ith information to be used in connection with preparation of the Company's [] Annual Report on Form 10-K to be filed with the U.S. Securities and Exchange Commission [] and the Company's Proxy Statement for its [] Annual Meeting of Stockholders.

59.    The questionnaires instructed that Wiederhorn disclose whether he or any immediate family member had:

> [A]ny material interest, direct or indirect, in any transaction or series of similar transactions or proposed transaction or proposed series of similar transactions to which the Company or any of its subsidiaries was or is to be a party, and in which the amount involved exceeds $120,000.

60.    Wiederhorn answered "no" to this question despite knowing that he had a direct or indirect material interest in the transfers from FAT to FCCG that funded the Wiederhorn Personal Cash Transfers, knowing Thayer (Wiederhorn's immediate

family) had a direct or indirect material interest in the Thayer Transactions between 2017 and 2019, and the fact that one or both of these series of transactions exceeded $120,000 each year from 2018 through 2020.

61.     Similarly, the questionnaires asked whether Wiederhorn:

Had received at any time during the previous 24 months, or do you currently have outstanding any loan or extension of credit in the form of a personal loan from the Company or any of its affiliates?

62.     Despite FCCG being an affiliate of FAT, Wiederhorn always answered "no" to that question and did not disclose that he was taking funds in the form of personal loans from FCCG to fund the Wiederhorn Personal Cash Transfers each year.  Moreover, the Wiederhorn Personal Cash Transfers were a direct or indirect extension of credit in the form of personal loans from FAT to Wiederhorn, the Company's CEO.

63.     By engaging in this conduct, Wiederhorn furthered his scheme by creating a false appearance that the funds that FAT was sending to FCCG were being used solely for business purposes and that the Company had sufficient cash on hand to pay its bills.

**F.     Wiederhorn Violated the Internal Controls Implemented by the FAT Board**

64.     During the course of FAT's 2019 audit, FAT's auditor advised the Company's audit committee of a "significant deficiency" in FAT's internal control over financial reporting.  Specifically, in early 2020, FAT's auditor identified that "The CEO has the ability to transfer funds for parent company advances at no limit without board approval" and that there was a "lack of sufficient controls around the financial reporting process."

65.     At an April 14, 2020 board meeting, the FAT Board asked Wiederhorn numerous questions about the purpose of FAT continuing to make loans to FCCG.  In response, Wiederhorn told the FAT Board that the loans were for the purpose of

paying off FCCG's company creditors and business expenses.  Wiederhorn concealed his personal interest in these transactions and the fact that most of the funds FAT had loaned to FCCG were being used for the Wiederhorn Personal Cash Transfers.

66.   Based on these false statements by Wiederhorn, the FAT Board approved the Company continuing to send loans to FCGG through an Intercompany Revolving Credit Agreement (the "Intercompany Agreement") at the April 14, 2020 meeting.

67.   The FAT Board would not have approved these additional loans if it had known that the funds were and would be used to fund the Wiederhorn Personal Cash Transfers.

68.   In response to the auditor's significant deficiency finding, the Intercompany Agreement included a control, added by the FAT Board, requiring that any additional lending to FCCG be approved in advance by the FAT Board.  The FAT Board approved this control at the April 14, 2020 meeting.

69.   At an April 21, 2020 meeting, the FAT Board again asked Wiederhorn "numerous questions and engaged in rigorous discussion about the Intercompany Revolving Credit Agreement [] between the Company and FCCG and the intended uses of cash and the Company's business reasons for the Company to make advances to FCCG."  Wiederhorn again represented that the money would be used by FCCG to pay its legacy liabilities and again concealed his personal use of the funds.

70.   Based on these false statements, the FAT Board approved another $50,000 of additional lending to FCCG.  Wiederhorn violated this Board-imposed limitation and internal control by transferring almost $80,000 from FAT to FCCG between April 15, 2020 and April 27, 2020.

71.   Subsequently, at an April 28, 2020 meeting, the FAT Board approved one final loan amount of $1 million to FCCG for second quarter of 2020.

72.   However, after that date, without the FAT Board's approval and in contravention of the Intercompany Agreement, Wiederhorn continued to lend to

FCCG millions of dollars and used the majority of the funds to make the Wiederhorn Personal Cash Transfers.

73.     From April 28, 2020 through approximately June 2020, Wiederhorn directed hundreds of thousands of dollars in transfers from FAT to FCCG beyond the $1 million authorized by the FAT Board.

74.     In the third quarter of 2020, Wiederhorn directed another $3 million in loans from FAT to FCCG, although the FAT Board authorized only $1 million.

75.     In the fourth quarter of 2020, Wiederhorn directed over $3.5 million in loans from FAT to FCCG.

**G.     The Wiederhorn Children Were Officers at FAT**

76.     During the Relevant Period, three of Wiederhorn's children, including Thayer, were highly paid officers at FAT.  Two Wiederhorn children, including Thayer, had salaries of $300,000 a year in 2018 and 2019, and the third had a salary of $250,000 (the "Wiederhorn Children Salaries").

77.     The Wiederhorn Children Salaries were not publicly disclosed to the Company's investors until November 2020, when it filed its 2020 Schedule 14A Proxy Statement.

**H.     FAT's 2022 Special Review Committee Investigation**

78.     In 2022, after learning of the SEC's investigation, the FAT Board learned that Wiederhorn had been potentially using the loans from FAT to FCCG for his personal benefit.

79.     In response, the FAT Board formed a Special Review Committee (the "Committee") consisting of independent board members to conduct an internal investigation into FAT's loans to FCCG.

80.     During its investigation, the Committee confirmed that FAT's loans to FCCG funded the Wiederhorn Personal Cash Transfers.

**I.     In 2023, Wiederhorn Terminated the FAT Board**

81.     On December 20, 2022, Wiederhorn terminated the chair of the

Committee.

82. In February 2023, the FAT executive chairman of the FAT Board, having learned of the findings of the internal investigation, told Wiederhorn that he should resign as CEO or the FAT Board would likely take action against Wiederhorn.

83. On March 28, 2023, Wiederhorn terminated the FAT executive chairman and all of the other independent directors on the FAT Board. He then placed three of his children, including Thayer, on the FAT Board.

**J.  The Wiederhorn Personal Cash Transfers, the Thayer Transactions, and the Wiederhorn Children Salaries Were Related Person Transactions That FAT Was Required to Report Under Item 404**

84. The Wiederhorn Personal Cash Transfers were related person transactions under Item 404.

85. The transfers from FAT to FCCG that funded the Wiederhorn Personal Cash Transfers amounted to more than $120,000 each fiscal year from 2017-2020.

86. Wiederhorn at all relevant times was a director and CEO of FAT, and therefore a related person of the Company.

87. Wiederhorn had a direct or indirect material interest in the transfers from FAT to FCCG because the transfers from FAT to FCCG funded the Wiederhorn Personal Cash Transfers, which were used on Wiederhorn's personal spending. He used the transfers from FAT for his own personal benefit to, among other things, purchase travel on private jets, first class airfare, luxury vacations, his mortgage payments, shopping, and jewelry. Wiederhorn's interest in the transfers from FAT was material given that the transfers were for the purpose of funding his personal accounts or paying his personal debts, the amount far exceeded his publicly disclosed salary each year, and the amounts were equivalent to approximately 44 percent of FAT's revenue from October 2017 through December 2020 and 40 percent of FAT's revenue from July 2018 through December 2020.

88. The Thayer Transactions were also related person transactions under

Item 404.

89.     The Thayer Transactions amounted to more than $120,000 in each year from 2017 to 2019, and Thayer was an immediate family member of Wiederhorn and was the chief marketing officer of FAT.

90.     Thayer also had a direct or indirect material interest in the Thayer Transactions, as he used his own personal accounts to transfer substantial funds into FAT.  Thayer's interest in the Thayer Transactions was material given that over $9 million, which was an amount equal to about 21 percent of FAT's revenue from October 2017 through December 2019, was deposited into his personal accounts over which only he had access or control.

91.     The Wiederhorn Children Salaries were related person transactions under Item 404.

92.     The Wiederhorn children were immediate family members of Wiederhorn, and they had a direct or indirect material interest in their salaries.

93.     The Wiederhorn Children Salaries each amounted to more than $120,000 in fiscal years 2018 and 2019.  The Wiederhorn Children Salaries were material given these salaries were paid to the CEO's children, and also because their salaries amounted to approximately 4-5 percent of FAT's revenue.

**K.     Ron Roe's Role During the Relevant Period**

**1.     Roe Approved the Wiederhorn Personal Cash Transfers and the Thayer Transactions and Signed FAT's 2017 Form 10-K**

94.     Prior to working at FAT as its Chief Financial Officer, Roe was previously employed as FCCG's CFO.

95.     At FCCG, Roe routinely assisted Wiederhorn in sending funds from FCCG's accounts, or its subsidiaries Fatburger and Buffalo, to Wiederhorn, his family, and his personal creditors.

96.     After the FAT IPO, Roe continued this practice at FAT from October 2017 through December 2020, despite the fact that the Company had additional

requirements to disclose related person transactions under Item 404.

97.    Roe often approved and sent the transfers from FAT to Wiederhorn, his family, or his creditors, including transfers that first passed through FCCG, and then directed the FAT cash managers on how the transfers should be recorded in FAT and FCCG's accounting records.

98.    Specifically, FAT's cash managers reported to Roe, and he told the FAT cash managers which transfers of FAT's funds were for Wiederhorn's personal expenses, and how those transfers should be recorded in FAT and FCCG's books.

99.    Roe also instructed the FAT cash managers to use funds from FAT's accounts to pay Wiederhorn's personal bank accounts, his credit card bills, and any of his creditors at Wiederhorn's request.

100.    Roe also directed the FAT cash managers on how the Thayer Transactions were recorded in FAT and FCCG's accounting records.

101.    From 2017 through 2019, Roe personally recorded, or directed FAT cash managers how to record, the Thayer Transactions.

102.    As FAT's CEO, Roe signed FAT's 2017 Form 10-K, which falsely and misleadingly stated that FAT had disclosed all related person transactions.

103.    Roe knew, or was reckless in not knowing, that the Thayer Transactions exceeded $120,000 in fiscal year 2017 and were therefore related person transactions that required disclosure, yet had not been properly disclosed.

### 2.    Roe Was Aware of Wiederhorn's False Representations to the FAT Board

104.    Given his role in recording Wiederhorn Personal Cash Transfers and the Thayer Transactions, Roe knew, or was reckless in not knowing, that the funds FAT transferred to FCCG were primarily being used by Wiederhorn to fund the Wiederhorn Personal Cash Transfers for Wiederhorn's personal benefit.

105.    For example, Roe was included in the May 2019 and April 2020 email communications, referenced *supra* in paragraphs 56 and 57, between Wiederhorn and

the FAT Board, where Wiederhorn concealed that the funds FAT was sending to FCCG were primarily being used for the Wiederhorn Personal Cash Transfers.

106.   In another example, Roe also attended the FAT Board meetings in April 2020 where Wiederhorn falsely represented to the FAT Board that the purpose of FAT's loans to FCCG was to pay FCCG's business expenses and FCCG's creditors. Roe was also a signatory of the Intercompany Agreement and attended the April 14, 2020 meeting wherein the FAT Board added an internal control requiring that any additional lending to FCCG be approved in advance by the FAT Board.

107.   Roe therefore also knew, or was reckless in not knowing, that Wiederhorn made false and misleading statements to the FAT Board about the true purpose of FAT lending millions in cash to FCCG and, despite being an executive officer of FAT, did not take steps to correct those statements to the FAT Board.

### L.     Rebecca Hershinger's Role During the Relevant Period

####        1.     Hershinger Was Aware that Wiederhorn used the Wiederhorn Personal Cash Transfers for His Personal Benefit and Was Aware of the Wiederhorn Children Salaries

108.   Hershinger succeeded Roe as FAT's Chief Financial Officer.  As FAT's Chief Financial Officer from 2018 to 2021, Hershinger knew, or was reckless in not knowing, that Wiederhorn was using substantial sums of FAT's funds for his personal spending and that Thayer was wiring millions of dollars into FAT.

109.   For example, in October 2018, Hershinger circulated a ledger of FAT's loans to FCCG internally to Roe and others, which showed more than $1 million in wires going from FAT directly into Wiederhorn's personal accounts, more than $3 million in wires in Thayer Transactions, and hundreds of thousands of dollars of entries described as "AW AMEX."

110.   Similarly, in March 2019, Hershinger had communications with FAT's cash team that the Company was paying Wiederhorn's personal credit cards using the funds that FAT was loaning to FCCG.

111.   As another example, in May 2019, Hershinger circulated FCCG's December 2018 consolidating worksheets showing that Wiederhorn had received over $9 million from FAT in 2018 alone.

112.   Likewise, in May 2020, Hershinger personally performed an account reconciliation of the money due from FCCG to FAT.  This reconciliation included her analysis of FCCG's bank accounts reflecting at least one million dollars in transfers from FAT to FCCG, which were transferred to Wiederhorn's personal bank accounts in the form of Wiederhorn Personal Cash Transfers in the first quarter of 2020 alone.

113.   Finally, as FAT's CFO, Hershinger regularly reviewed FAT's budgets which reflected the Wiederhorn Children Salaries.  Accordingly, Hershinger knew, or should have known, the Wiederhorn Children Salaries by early 2019 when she reviewed FAT's fiscal year 2018 documentation in preparing the Company's 10-K.

114.   Hershinger reviewed, approved, and signed FAT's Form 10-Ks from years 2018-2020.

115.   Despite knowing, or being reckless in not knowing, that both the Thayer Transactions and the Wiederhorn Children Salaries exceeded $120,000 in 2018 and 2019, and that the Wiederhorn Personal Cash Transfers exceeded $120,000 in 2018, 2019 and 2020, but none had been disclosed as related person transactions, Hershinger signed FAT's Form 10-Ks which falsely and misleadingly stated that FAT had disclosed all related person transactions.

**2.      Hershinger Was Aware that Wiederhorn Made False Representations to the FAT Board as well as on His Director and Officer Questionnaires**

116.   In February 2019, Hershinger, in her role as Chief Financial Officer of FAT, requested that Wiederhorn complete his director and officer questionnaire for fiscal year 2018.  Wiederhorn then sent Hershinger the completed FAT's director and officer questionnaire in or around March 2019.

117.   Wiederhorn's completed questionnaire did not disclose that Wiederhorn

18

had an interest in the transfers from FAT to FCCG, including that FAT was paying his personal credit cards.  Instead, Wiederhorn's signed questionnaire falsely stated that neither Wiederhorn nor his family had a direct or indirect material interest in any transaction or series of transactions to which FAT was a party and in which the dollar amount exceeded $120,000.

118.   Hershinger knew, or was reckless in not knowing, that Wiederhorn was personally benefitting from the transfers from FAT to FCCG, and that Thayer was wiring millions of dollars into FAT.   Yet in March 2020, Hershinger emailed Wiederhorn a pre-completed questionnaire for FAT's 2019 Form 10-K, which contained the false answers from his 2018 questionnaire.

119.   In addition, almost a year later in February 2021, Hershinger directed FAT employees to transfer the answers from Wiederhorn's 2019 questionnaire to Wiederhorn's 2020 questionnaire "exactly as presented."

120.   Like Roe, Hershinger attended the FAT Board meetings in April 2020 referenced *supra* in paragraphs 56 and 57 where Wiederhorn falsely represented to the FAT Board that the purpose of the FAT's loans to FCCG was to pay FCCG's business expenses and FCCG's creditors.

121.   Finally, Hershinger also attended the April 14, 2020 meeting wherein the FAT Board added an internal control requiring that any additional lending to FCCG be approved in advance by the FAT Board.  Given her role as CFO, her role in performing the May 2020 account reconciliation, her role in preparing FAT's financial statements which reflected the additional lending to FCCG in each quarter, and the fact that she attended the FAT Board meetings where the Board placed specific limits on the amounts Wiederhorn was permitted to lend to FCCG, Hershinger was aware that Wiederhorn continued to lend money to FCCG in excess of the amounts authorized by the FAT Board.

### M.   Wiederhorn, Roe, and Hershinger Lied to FAT's Auditors

122.   During the Relevant Period, FAT retained outside auditors to conduct

annual audits and quarterly reviews.

123.   Wiederhorn, Roe, and Hershinger made numerous false statements to FAT's auditors relating to the Wiederhorn Personal Cash Transfers, the Thayer Transactions, and/or the Wiederhorn Children Salaries.

124.   In February 2019, Wiederhorn signed and submitted to FAT's auditors a related party questionnaire falsely representing that neither he nor any of his immediate family members had an interest in any transactions with the Company, despite Wiederhorn knowing that he had an interest in FAT's transfers from FAT to FCCG and that his son Thayer had an interest in the Thayer Transactions.

125.   During the 2019 audit of FAT, the Company's auditor asked Wiederhorn about the purpose of FAT paying his personal credit card.  In response, Wiederhorn falsely stated to the auditor that FAT had paid his personal credit card because the "charges were for [FCCG] expenses."

126.   Around this same time, Wiederhorn falsely stated to the auditor that certain expenses identified as "AW Personal" were in fact FCCG business expenses.

127.   In March 2020, in response to the auditor asking Wiederhorn about the purpose of FAT loaning money to FCCG, Wiederhorn falsely told the auditor that the purpose of the loans was to assist FCCG with paying ongoing and legacy liabilities and business expenses.

128.   Each year during the Relevant Period, in his role as the Company's CEO, Wiederhorn was required to sign annual management representation letters directed to FAT's auditors.

129.   The management representation letters were relied on by the auditors in rendering an opinion concerning the accuracy of FAT's financial statements.

130.   In these letters, Wiederhorn represented to FAT's auditors that the Company had made available "All financial records and related data, including names of all related parties and all relationships and transactions with related parties."

131.   Wiederhorn also represented that "[w]e have disclosed to you the

identity of [FAT]'s related parties and all information concerning related-party relationships, transactions and amounts receivable from or payable to related parties of which we are aware."

132.   Wiederhorn's representations were materially false and misleading. Despite representing that he had disclosed all related parties and all relationships and transactions with related parties, Wiederhorn did not properly disclose his own related party transactions with FAT, the fact that he was using FAT's loans to FCCG for his Wiederhorn Personal Cash Transfers, or the Thayer Transactions.

133.   In addition, despite the fact that Wiederhorn was taking direct or indirect loans from FAT in the form of personal loans that funded the Wiederhorn Personal Cash Transfers, he falsely represented in pertinent part to FAT's auditors in annual management representation letters that the Company:

> [H]as not, directly or indirectly, including through any subsidiary, extended or maintained credit, arranged for the extension of credit or renewed an extension of credit in the form of a personal loan to or for any director or executive officer.

134.   Roe and Hershinger also reviewed, approved, signed, and certified the false management representation letters during the Relevant Period as the respective CFOs of the Company.

135.   Roe co-signed and certified the 2017 management representation letter.

136.   Hershinger co-signed and certified the 2018, 2019, and 2020 management representation letters.

137.   The 2017 management letter contained false and misleading representations and omitted material information because the Company had not disclosed Wiederhorn's direct or indirect material interest in the Wiederhorn Personal Cash Transfers or the Thayer Transactions to the auditors.

138.   The 2018 management letter contained false and misleading representations and omitted material information because the Company had not disclosed Wiederhorn's direct or indirect material interest in the Wiederhorn Personal

Cash Transfers or the Thayer Transactions to the auditors.

139.   The 2019 management letter contained false and misleading representations and omitted material information because the Company had not disclosed Wiederhorn's direct or indirect material interest in the Wiederhorn Personal Cash Transfers or the Thayer Transactions to the auditors.

140.   The 2020 management letter contained false and misleading representations and omitted material information because the Company had not disclosed Wiederhorn's direct or indirect material interest in the Wiederhorn Personal Cash Transfers or the Thayer Transactions to the auditors.

141.   Roe made additional false statements to FAT's auditors throughout the Relevant Period.

142.   In a March 2018 interview with FAT's auditor, the auditor asked Roe to identify all related parties with whom FAT had a transaction, a description of the transactions, and the business purpose of those transactions.

143.   Roe identified only FCCG and Buffalo as related parties with an interest in transactions in which FAT was a participant.  Roe did not identify either Wiederhorn or Thayer as related parties with interests in FAT's transactions, even though he assisted Wiederhorn with transferring FAT's funds through the Wiederhorn Personal Cash Transfers and after having personally reviewed and recorded the Thayer Transactions in the Company's accounting records.  By engaging in this conduct, Roe assisted Wiederhorn in concealing the Wiederhorn Personal Cash Transfers and the Thayer Transactions from FAT's auditors.

144.   In September and October 2020, Roe provided the auditor with a purported loan agreement which he claimed represented that FCCG's board of directors had approved $25 million in loans from FCCG to Wiederhorn in January 2018.

145.   However, Roe's representation to the auditors was false because FCCG's board of directors were never aware of and did not approve either the loan

agreement or the loans.

146.   Hershinger also made additional false statements to FAT's auditors throughout the Relevant Period.

147.   In 2019 and 2020, Hershinger represented to the Company's auditors that the Wiederhorn Children Salaries had "been disclosed in prior periods proxy statements."

148.   These representations to the Company's auditors in 2019 and 2020 were not true because FAT did not report Wiederhorn Children Salaries as related person transactions (or otherwise) until November 2020, when it filed its 2020 Schedule 14A Proxy Statement.

### N.   FAT's SEC Filings Contained Materially False and Misleading Statements

149.   As a public reporting company, FAT filed quarterly Forms 10-Q, annual Forms 10-K, and annual Schedule 14A Proxy Statements with the SEC during the Relevant Period.  In addition, FAT also conducted an offering in September 2019 pursuant to Regulation A and a separate offering in July 2020 pursuant to Form S-1.

150.   FAT's public filings during the Relevant Period contained numerous false and misleading statements regarding (1) the Wiederhorn Personal Cash Transfers, (2) the Thayer Transactions, (3) the Wiederhorn Children Salaries, and (4) the Company's use of investment and loan proceeds.

### 1.   Materially False and Misleading Statements Regarding the Wiederhorn Personal Cash Transfers and the Thayer Transactions

151.   FAT's Forms 10-K contained false and misleading statements regarding the Wiederhorn Personal Cash Transfers and the Thayer Transactions.

152.   FAT's 2017 Form 10-K represented that the company had "open accounts with affiliated entities under the common control of FCCG resulting in net amounts due to [FAT] of $7,963,000 as of December 31, 2017."

153.   Apart from these transactions with FCCG, FAT's 2017 Form 10-K represented that: "there has not been, nor is there currently proposed, any transaction or series of similar transactions to which [FAT] was or will be a party in which the amount involved exceeds $120,000 and in which any director, executive officer, shareholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest."

154.   FAT's 2018 Schedule 14A Proxy Statement incorporated the disclosures in FAT's 2017 Form 10-K and represented that there were no reportable related person transactions other than those described in FAT's 2017 Form 10-K.

155.   These affirmative statements in FAT's 2017 Form 10-K and its 2018 Proxy Statement were materially false and misleading half-truths because neither filing properly disclosed that: (i) Wiederhorn used more than $1 million of FAT funds on Wiederhorn Personal Cash Transfers for his personal expenses between October and December 2017; and (ii) the approximately $220,000 in Thayer Transactions between October and December 2017.

156.   FAT's 2018 Form 10-K further represented that "Since January 1, 2018, the Company has engaged in certain transactions with Fog Cutter Capital Group Inc." and had "open accounts with affiliated entities under the common control of FCCG resulting net amounts due to the Company of $15,514,000."

157.   Apart from these transactions with FCCG, FAT's 2018 Form 10-K also represented that "there has not been, nor is there currently proposed, any transaction or series of similar transactions to which [FAT] were or will be a party in which the amount involved exceeds $120,000 and in which any director, executive officer, shareholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest."

158.   FAT's 2019 Schedule 14A Proxy Statement similarly identified related person transactions between FAT and FCCG and further represented that "since the beginning of the 2018 fiscal year" there were no reportable related person

transactions, other than those described in FAT's 2018 Form 10-K or the Proxy Statement.

159.   These affirmative statements in FAT's 2018 Form 10-K and its 2019 Proxy Statement were materially false and misleading half-truths because neither filing properly disclosed that Wiederhorn was the primary beneficiary of the loans from FAT to FCCG and that Wiederhorn used almost $9 million of FAT funds on Wiederhorn Personal Cash Transfers for his personal expenses between January and December 2018.  Similarly, the Company's 2018 10-K and 2019 Proxy Statement did not properly disclose the approximately $5.5 million in Thayer Transactions between January and December 2018.  Finally, the Company's 2018 10-K and 2019 Proxy Statement did not properly disclose the Wiederhorn Children Salaries from January to December 2018.

160.   FAT's 2019 Form 10-K represented that "Since December 31, 2018, the Company has engaged in certain transactions with Fog Cutter Capital Group Inc." and had "$25,967,000 net amounts due to the Company."  Apart from these transactions with FCCG, FAT also represented that "there has not been, nor is there currently proposed, any transaction or series of similar transactions to which [FAT] were or will be a party in which the amount involved exceeds $120,000 and in which any director, executive officer, shareholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest."

161.   FAT's 2020 Schedule 14A Proxy Statement similarly identified related person transactions between FAT and FCCG and further represented that "since the beginning of the 2019 fiscal year" there were no reportable related person transactions, other than those described in FAT's 2019 Form 10-K or the Proxy Statement.

162.   These affirmative statements in FAT's 2019 Form 10-K and its 2020 Proxy Statement were materially false and misleading half-truths because these

filings did not properly disclose that Wiederhorn used about $7 million of FAT funds on Wiederhorn Personal Cash Transfers for his personal expenses between January and December 2019. Similarly, the Company's 2019 10-K and 2020 Proxy Statement did not properly disclose the more than $3.5 million in Thayer Transactions between January and December 2019. Finally, the 2019 10-K did not properly disclose the Wiederhorn Children Salaries from January to December 2019.

163. FAT's 2020 Form 10-K represented that "Since December 29, 2019, the Company has engaged in certain transactions with Fog Cutter Capital Group Inc," "the Company had previously extended credit to FCCG," and "FCCG historically made loan advances to Andrew A. Wiederhorn, its CEO and significant stockholder." Apart from these transactions, FAT further represented that "there has not been, nor is there currently proposed, any transaction or series of similar transactions to which [FAT] were or will be a party in which the amount involved exceeds $120,000 and in which any director, executive officer, shareholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest."

164. These affirmative statements were materially false and misleading half-truths because the 2020 10-K did not properly disclose that Wiederhorn had a direct or indirect material interest in the loans to FCCG or that Wiederhorn used approximately $9.6 million of FAT funds on Wiederhorn Personal Cash Transfers for his personal expenses between January and December 2020.

### 2. Materially False and Misleading Statements Regarding Use of Loan Proceeds and Proceeds from Securitization Notes

165. With approximately 40 percent of its revenue used by Wiederhorn to pay his personal expenses through the Wiederhorn Personal Cash Transfers, FAT needed financing from outside sources to fund its operations.

166. During the Relevant Period, FAT borrowed approximately $23.5 million from "Fund I" and "Fund II" ("the Funds"), two outside investment funds

incorporated in Delaware.

167.   On January 29, 2019, FAT borrowed $20 million in loans from Fund I, and on June 19, 2019, FAT borrowed an additional $3.5 million in loans from Fund II (collectively, the "Fund Proceeds").

168.   The loan proceeds from Fund I were primarily used to pay off FAT's existing loans from outside lenders, leaving FAT with only about $1.7 million in proceeds remaining.  Wiederhorn directed FAT's cash team to transfer approximately 25 percent of these funds to pay his personal debts.  From Fund II, Wiederhorn directed FAT's cash team to wire $550,000 of the loan proceeds, about 16 percent of the available proceeds, to an attorney to fund the settlement of a personal court judgment against Wiederhorn that was unrelated to FAT's business.

169.   FAT's 2018 and 2019 Forms 10-K, Q1-Q3 2019 Forms 10-Q, and September 2019 Regulation A offering statement contained affirmative false and misleading statements relating to FAT's use of the Fund Proceeds.

170.   For Fund I, FAT's 2018 and 2019 Forms 10-K, Forms 10-Q for Q1-Q3 2019, and September 2019 Regulation A offering disclosed that FAT had "borrowed $20 million [the Fund] and utilized the proceeds to repay the existing $16 million term loan from FB Lending, LLC plus accrued interest and fees, and provide additional general working capital to the Company."

171.   This affirmative statement was a materially false and misleading half-truth because Wiederhorn had in fact used a substantial amount of the remaining Fund Proceeds to pay down his personal debt.

172.   Similarly, for Fund II, FAT's 2019 Form 10-K, Forms 10-Q for Q2 and Q3 2019, and FAT's September 2019 Regulation A Offering Statement disclosed that the Company borrowed an additional $3.5 million from Fund II in June 2019 to fund the acquisition of another restaurant chain and to "acquire other assets and pay fees and expenses of the transactions."

173.   This affirmative statement was a materially false and misleading half-

truth because on the same day that FAT received the funds from Fund II, at Wiederhorn's direction, FAT had in fact wired approximately 16 percent of the Fund Proceeds to pay his personal creditor.

174. In addition to the Fund Proceeds it received from the Funds, FAT raised additional capital on March 6, 2020, by issuing notes pursuant to an asset-backed securitization (the "Securitization Notes"). The net proceeds from the issuance of these Securitization Notes was $37,314,000. FAT used $26,771,000 of these proceeds to pay off its outstanding balance owed to the Funds. The remaining proceeds amounted to approximately $10.5 million.

175. On March 9, 2020, FAT sent approximately $2.8 million of the remaining proceeds to FCCG, of which approximately $1.2 million was immediately sent to Wiederhorn, his family, and his personal creditors as Wiederhorn Personal Cash Transfers.

176. In its 2019 and 2020 Forms 10-K, Q1 through Q3 2020 Forms 10-Q, and July 2020 Form S-1 Offering Statement, however, FAT disclosed the use of the proceeds from the Securitization Notes as follows:

> Net proceeds from the issuance of the Securitization Notes were $37,314,000 . . . A portion of the proceeds from the Securitization was used to repay the remaining $26,771,000 in outstanding balance under the [Fund] Loan and Security Agreement. The remaining proceeds from the Securitization will be used for working capital.

177. These affirmative statements were materially false and misleading half-truths because, before this disclosure was made, approximately 27 percent of the $10.5 million had been used for purposes other than for FAT's "working capital," and approximately 12 percent was used for Wiederhorn Personal Cash Transfers.

### 3. Materially False and Misleading Statements Regarding the Wiederhorn Children Salaries

178. FAT's 2018 and 2019 Forms 10-K and FAT's 2018 and 2019 Schedule

28

14A Proxy Statements represented that apart from certain transactions with FCCG:

> there has not been, nor is there currently proposed, any transaction or series of similar transactions to which [FAT] were or will be a party in which the amount involved exceeds $120,000 and in which any director, executive officer, shareholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest.

179.   These affirmative statements were materially false and misleading half-truths because the Forms 10-K and Schedule 14A Proxy Statements did not disclose the Wiederhorn Children Salaries.

### 4.   Wiederhorn, Roe, and Hershinger Signed and Certified FAT's Public Filings

180.   As the Chief Executive Officer FAT, Wiederhorn was responsible for reviewing and approving the Company's reports filed with the SEC.  In connection with signing these reports, he signed certifications under the Sarbanes-Oxley Act of 2002, attesting that, among other things, each report "did not include any material misstatements or omissions."

181.   As the Chief Financial Officer of FAT, Roe was responsible for reviewing and approving the Company's reports filed with the SEC.  In connection with signing these reports, he signed a certification under the Sarbanes-Oxley Act of 2002, attesting that, among other things, each report "did not include any material misstatements or omissions."

182.   As the Chief Financial Officer of FAT, Hershinger was responsible for reviewing and approving the Company's reports filed with the SEC.  In connection with signing these reports, she signed certifications under the Sarbanes-Oxley Act of 2002, attesting that, among other things, each report "did not include any material misstatements or omissions."

183.   Wiederhorn, as the Chief Executive Officer of FAT, reviewed, approved, signed, and certified (1) each of FAT's Forms 10-K for fiscal years 2017-2020, (2)

each of FAT's Forms 10-Q for Q1-Q3 2019 and Q1-Q3 2020, (3) the 2018-2020 Schedule 14A Proxy Statements, (4) the September 2019 Regulation A Offering Statement, and (5) the July 2020 Form S-1 Offering Statement. Wiederhorn was therefore the maker of the false statements in these filings.

184. Roe, as the Chief Financial Officer of FAT, reviewed, approved, signed, and certified the FAT Form 10-K for fiscal year 2017. Roe was therefore the maker of the false statements in this filing.

185. Hershinger, as the Chief Financial Officer of FAT, reviewed, approved, signed, and certified the FAT Forms 10-K for fiscal years 2018-2020 and the Company's July 2020 Form S-1 Offering Statement. Hershinger was therefore the maker of the false statements in these filings.

## O.  Wiederhorn's Fraudulent Schemes

186. From July 2018, when FAT reported that the FCCG Promissory Note was almost fully paid back, until March 2021, Wiederhorn engaged in a scheme to divert FAT's cash to fund the Wiederhorn Personal Cash Transfers for his own personal benefit while concealing these transfers from the FAT Board, FAT's auditors, and investors. He executed this scheme by directing Roe and the FAT cash managers to effectuate the Wiederhorn Personal Cash Transfers for his personal benefit and by misleading the FAT Board and FAT's auditors about the loans FAT was making to FCCG.

187. In addition, between October 2017 and December 2019, Wiederhorn engaged in a scheme to conceal FAT's inability to pay its own bills by directing over $9 million in Thayer Transactions.

188. Wiederhorn engaged in numerous deceptive acts to create false appearances of fact to further his schemes, including: not disclosing the Wiederhorn Personal Cash Transfers or the Thayer Transactions in his director and officer questionnaires and related party questionnaire, making false statements to the FAT Board and FAT's auditors about the purpose of the loans from FAT to FCCG; and

disseminating false statements by signing FAT company filings containing false and misleading representations about related person transactions.

189.   Between July 2018 and December 2020, Roe substantially assisted Wiederhorn with his scheme to divert FAT's cash to fund the Wiederhorn Personal Cash Transfers for his own personal benefit.  Between October 2017 and December 2019, Roe assisted Wiederhorn with his scheme to conceal FAT's inability to pay its own bills by directing over $9 million in Thayer Transactions.

190.   Between October 2017 and December 2020, Roe oversaw the FAT cash management team and directed to which of Wiederhorn's accounts to send FAT funds and effectuating many of the transfers himself.  Despite being an executive officer of FAT and knowing all the details about the Wiederhorn transfers and the Thayer Transactions, Roe did not inform the FAT Board when he knew, or was reckless in not knowing, that Wiederhorn misled them about how the proceeds of FAT's loans to FCCG were being used. Roe also reviewed, revised, and signed FAT's 2017 Form 10-K thereby assisting Wiederhorn in disseminating false and misleading statements which concealed Wiederhorn's schemes.

**P.   FAT's False and Misleading Statements and Wiederhorn's Fraudulent Schemes Were in Connection with the Offer or Sale of Securities**

191.   Wiederhorn's scheme and FAT's false and misleading statements were in connection with the offer or sale of securities.

192.   Throughout the Relevant Period, while Wiederhorn engaged in his fraudulent scheme, FAT's shares were publicly traded on the NASDAQ, a public stock exchange based in the United States.

193.   On June 6, 2019, FAT filed a Form 1-A Regulation A Offering Statement. The offering incorporated by reference the false and misleading statements about related person transactions and use of proceeds made in FAT's 2018 Form 10-K and Q2 2019 Form 10-Q filings and restated the false and misleading

statements regarding the use of Lion Fund Proceeds. Through the offering, FAT issued securities in the form of shares of FAT and raised proceeds from investors of approximately $1,077,000.

194.   On July 13, 2020, FAT filed a Form S-1 Registration statement and amendments.  The offering statement incorporated by reference the false and misleading statements about related person transactions made in FAT's 2019 Form 10-K filing and restated the false and misleading statements about the use of proceeds from the Securitization Notes. Through the offering, FAT issued securities in the form of shares of FAT and raised proceeds from investors of $8,021,000.

## Q.   FAT's False and Misleading Statements Were Material

195.   The false and misleading statements regarding the Wiederhorn Personal Cash Transfers, the Thayer Transactions, the Wiederhorn Children Salaries, and the Use of Proceeds were material.

196.   The approximately $26.7 million in FAT funds that Wiederhorn used to fund the Wiederhorn Personal Cash Transfers from October 2017 through December 2020 amounted to approximately 44 percent of FAT's total revenue during this period.  The approximately $20 million FAT funds that Wiederhorn used to fund the Wiederhorn Personal Cash Transfers from July 2018 through December 2020 amounted to approximately 40 percent of FAT's total revenue during this period.

197.   A reasonable investor would have considered it important that Wiederhorn channeled almost half of FAT's revenue to himself for his personal use.

198.   Moreover, FAT's board of directors would not have approved company loans or transfers to FCCG during the Relevant Period if they had known that they were funding Wiederhorn's expenses personally.

199.   The Thayer Transactions from October 2017 through December 2019 amounted to approximately 21 percent of FAT's revenue during this period.

200.   A reasonable investor would have considered it important that Wiederhorn used millions in Thayer Transactions to conceal the fact that FAT was

32

unable to pay its bills.

201.    Similarly, the false and misleading statements regarding the Use of Proceeds in 2019 and 2020 were material because a reasonable investor would have found it important to know that FAT's CEO was using FAT's money for himself or on his family and not using proceeds on "general working capital" or for the benefit of the Company as represented in FAT's SEC filings.

202.    Finally, the false and misleading statements regarding the Wiederhorn Children Salaries were material because a reasonable investor of FAT would have found it important to know that the children of the CEO were earning at least a quarter million dollars each in 2018 and 2019.

203.    During this period, the Wiederhorn Children Salaries amounted to between approximately 4 percent and 5 percent of FAT's total revenue.

### R.    Wiederhorn, Roe, and Hershinger Acted with Scienter

204.    During the Relevant Period, Wiederhorn acted with scienter. Wiederhorn directed the Wiederhorn Personal Cash Transfers and the Thayer Transactions to personally benefit from FAT's funds.  He hid both the Wiederhorn Personal Cash Transfers and the Thayer Transactions from the FAT Board, the company's auditors, and FAT's investors.

205.    Wiederhorn reviewed, edited, approved, and signed FAT's Forms 10-Ks and other company filings.  He therefore knew, or was reckless in not knowing, that he disseminated the false statements contained in FAT's Forms 10-Ks and other company filings in furtherance of his scheme which misrepresented the Wiederhorn Personal Cash Transfers and the Thayer Transactions.

206.    Wiederhorn also misrepresented the purpose of FAT's loans and concealed the Wiederhorn Personal Cash Transfers from the FAT Board in both email communications and statements made during meetings, as well as submitted false and misleading questionnaires and management representation letters to the Company's auditors concealing both the Wiederhorn Personal Cash Transfers and

Thayer Transactions.

207.   As the CEO of FAT, Wiederhorn also knew of the Wiederhorn Children Salaries, and yet did not disclose the Wiederhorn Children Salaries in the FAT Forms 10-K or Schedule 14A Proxy Statements for FY 2018 and 2019.

208.   Wiederhorn's conduct in connection with the Wiederhorn Personal Cash Transfer, the Thayer Transactions, and the Wiederhorn Children Salaries was unreasonable under the circumstances, and by engaging in that conduct, he also acted negligently.

209.   Roe also acted with scienter.  Throughout the Relevant Period, Roe personally oversaw the FAT cash team and approved sending the Wiederhorn Personal Cash Transfers from FAT's company accounts for Wiederhorn's benefit. Roe also instructed the FAT cash managers to use funds from FAT's accounts to pay Wiederhorn's personal credit card bills, and often paid the credit card bills himself using FAT's funds.  He also personally directed the FAT cash managers on the Thayer Transactions.

210.   During the Relevant Period, Roe also signed the FAT 2017 10-K which he knew, or was reckless in not knowing, represented to FAT investors that FAT had engaged in no reportable related person transactions with Wiederhorn or his immediate family.  Roe also co-signed FAT's 2017 management representation letter with Wiederhorn which represented that all related party transactions had been disclosed, despite knowing, or being reckless in not knowing, that neither he nor Wiederhorn had disclosed that Wiederhorn was using FAT funds for the Wiederhorn Personal Cash Transfers for his personal use, or the Thayer Transactions.  In May 2019 and April 2020, Roe, as an executive officer of FAT, was copied on emails between Wiederhorn and FAT's Board wherein Wiederhorn concealed that the primary purpose of the lending from FAT to FCCG was to fund the Wiederhorn Cash Transfers.  Roe knowingly or recklessly did not correct Wiederhorn's representations to the FAT board.

211.   Roe's conduct in connection with the Wiederhorn Personal Cash Transfers and the Thayer Transactions was unreasonable under the circumstances, and by engaging in that conduct, he also acted negligently.

212.   Hershinger also acted with scienter.  In both 2019 and 2020, Hershinger accessed FAT's loan ledger as well as FCCG's loan ledger which reflected millions of dollars in wires to Wiederhorn's personal accounts.  In May 2019, she circulated documents showing more than $9 million in Wiederhorn Personal Cash Transfers in 2018.  In addition, in March 2019, Hershinger had discussions with FAT's controller about the Company paying Wiederhorn's personal credit cards for his personal charges.  Hershinger also personally conducted a reconciliation analyzing banking transactions reflecting more than $1 million in Wiederhorn Cash Transfers.  However, Hershinger signed the FAT 2019 and 2020 10-Ks which she knew, or was reckless in not knowing, falsely represented to FAT investors that Wiederhorn was not involved in any related person transactions.

213.   Hershinger also received Wiederhorn's responses to FAT's director and officer questionnaires in 2019 and 2020, which she knew or was reckless in not knowing, misrepresented that Wiederhorn did not have a direct or indirect material interest in any transactions over $120,000 in which FAT was a participant.  However, Hershinger did not take any steps to correct Wiederhorn's misrepresentations, despite being the Chief Financial Officer of the company, and transferred his misleading responses in subsequent questionnaires, knowing, or being reckless in not knowing, they would be relied upon by the Company for purposes of preparing its Forms 10-K and proxy statement filings.

214.   Hershinger's conduct in connection with the Wiederhorn Personal Cash Transfers was unreasonable under the circumstances, and by engaging in that conduct, she also acted negligently.

215.   During the Relevant Period, Wiederhorn was a corporate officer acting as an agent for FAT within the scope of his employment.  Therefore, his intent can be

imputed to FAT.

216.   During the Relevant Period, Roe was a corporate officer acting as an agent for FAT within the scope of his employment.  Therefore, his intent can be imputed to FAT.

217.   During the Relevant Period, Hershinger was a corporate officer acting as an agent for FAT within the scope of her employment.  Therefore, her intent can be imputed to FAT.

### S.   FAT's Books and Records Were Inaccurate and the Company Failed to Maintain a Sufficient Internal Accounting Controls

218.   FAT failed to make and keep books and records that accurately reflected the reportable related person transactions.  Specifically, FAT failed to track and report its own CEO's direct or indirect material interest in the Company was sending to FCCG, an affiliate company.

219.   Wiederhorn made false and misleading statements in his director and officer questionnaires about reportable related person transactions that would have allowed FAT to accurately track and report those transactions.

220.   In addition, despite FAT's auditor notifying the FAT Board of an internal control deficiency relating to Wiederhorn having complete control over FAT's accounts in early 2020, FAT did not devise or maintain an internal accounting control system that provided reasonable assurance that access to assets was consistent with addressing this deficiency.  Despite the FAT Board devising a control on April 14, 2020 which required FAT Board advance approval for any additional lending to FCCG be approved in advance by the FAT Board, Wiederhorn authorized loan amounts from FAT to FCCG beyond the limits approved by the FAT Board.  As a result, during the second quarter, the third quarter, and the fourth quarter of 2020, Wiederhorn lent FAT money to FCCG far in excess of the FAT Board-approved amounts.

221.   Wiederhorn, as FAT's CEO, knew or was reckless in not knowing that

FAT failed to track, report, and disclose reportable related person transactions, that he could transfer money from FAT at his own discretion, and that he made false statements to the FAT Board at April 2020 meetings regarding the purpose of the FAT loans to FCCG. Wiederhorn was also aware that the FAT Board included a control on April 14, 2020 requiring that any additional lending to FCCG be approved in advance by the FAT Board, and that he authorized loan amounts from FAT to FCCG beyond the limits approved by the FAT Board. In addition, Wiederhorn signed director and officer questionnaires that made false and misleading statements about reportable related person transactions that would have allowed FAT to accurately track and report these transactions.

222. Roe, as FAT's CFO and SVP of finance, knew or was reckless in not knowing that FAT failed to track, report, and disclose reportable related person transactions, that Wiederhorn could transfer money from FAT at his own discretion, and that Wiederhorn made false statements to the FAT Board at April 2020 meetings regarding the purpose of the FAT loans to FCCG. Roe was a signatory of the Intercompany Agreement and attended the April 14, 2020 meeting wherein the FAT Board added an internal control requiring that any additional lending to FCCG be approved in advance by the FAT Board. However, Roe did not take any steps take any steps to implement an internal accounting control system that prevented Wiederhorn from circumventing or violating the FAT Board's internal control, despite being aware that Wiederhorn authorized loan amounts from FAT to FCCG beyond the limits approved by the FAT Board.

223. Hershinger, as FAT's CFO, knew or was reckless in not knowing that FAT failed to track, report, and disclose reportable related person transactions, that Wiederhorn could transfer money from FAT at his own discretion, and that Wiederhorn made false statements to the FAT Board at April 2020 meetings regarding the purpose of the FAT loans to FCCG. Hershinger attended the April 14, 2020 meeting wherein the FAT Board added an internal control requiring that any

additional lending to FCCG be approved in advance by the FAT Board.  However, Hershinger did not take any steps to implement an internal accounting control system that prevented Wiederhorn from circumventing or violating the FAT Board's internal control, despite being aware that Wiederhorn authorized loan amounts from FAT to FCCG beyond the limits approved by the FAT Board.

224.   Hershinger was also aware that Wiederhorn signed director and officer questionnaires that made false and misleading statements about reportable related person transactions that would have allowed FAT to accurately track and report these transactions.

**T.**   **The Statutory Period Has Been Tolled**

225.   FAT, Wiederhorn, and Roe executed tolling agreements suspending the period for one year and sixty days.

226.   Hershinger executed tolling agreements in 2023 and 2024 suspending the period for five months and sixty days.

**FIRST CLAIM FOR RELIEF**

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder**

**(against Wiederhorn)**

227.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

228.   As alleged above, Wiederhorn engaged in a scheme to defraud between July 2018 and March 2021 by, among other things, directing Roe and the FAT cash managers to effectuate the Wiederhorn Personal Cash Transfers for his personal benefit and misleading the FAT Board, FAT's auditors, and investors about the loans FAT was making to FCCG.

229.   As alleged above, Wiederhorn also engaged in a scheme to defraud between October 2017 and December 2019 by directing the Thayer Transactions, which alleviated and disguised FAT's inability to pay its own bills.

230.   Wiederhorn engaged in deceptive acts to create the false appearance of fact to further his schemes by not disclosing the Wiederhorn Personal Cash Transfers or the Thayer Transactions in his director and officer questionnaires and related party questionnaire and by lying to the FAT Board about the purpose of the loans from FAT to FCCG.  Wiederhorn also disseminated false statements by signing FAT company filings containing false and misleading representations about related person transactions.

231.   By engaging in the conduct described above, Defendant Wiederhorn, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: employed devices, schemes or artifices to defraud; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

232.   By engaging in the conduct described above, Defendant Wiederhorn, directly or indirectly, violated, and unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Offer and Sale of Securities**

**Violations of Securities Act Section 17(a)(1) and (3) of the Securities Act**

**(against Wiederhorn)**

233.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

234.   As alleged above, Wiederhorn engaged in a scheme to defraud between July 2018 and March 2021 by, among other things, directing Roe and the FAT cash managers to effectuate the Wiederhorn Personal Cash Transfers for his personal benefit and misleading the FAT Board, FAT's auditors, and investors about the loans FAT was making to FCCG.

235.   As alleged above, Wiederhorn also engaged in a scheme to defraud between October 2017 and December 2019 by directing the Thayer Transactions, which alleviated and disguised FAT's inability to pay its own bills.

236.   Wiederhorn engaged in deceptive acts to create the false appearance of fact to further his schemes by not disclosing the Wiederhorn Personal Cash Transfers or the Thayer Transactions in his director and officer questionnaires and related party questionnaire and by lying to the FAT Board about the purpose of the loans from FAT to FCCG.  Wiederhorn also disseminated false statements by signing FAT company filings containing false and misleading representations about related person transactions.

237.   In connection with the scheme, Wiederhorn realized ill-gotten gains in the form of Wiederhorn Personal Transfers funded by loans from FAT which were never repaid.

238.   At all relevant times and as alleged above, Wiederhorn acted with scienter, or in the alternative, was negligent.

239.   By engaging in the conduct described above, Defendant Wiederhorn, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails employed devices, schemes, or artifices to defraud; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

240.   By engaging in the conduct described above, Defendant Wiederhorn violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

///

///

///

///

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Wiederhorn's Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder and Securities Act Sections 17(a)(1) and (3) (against Roe)**

241. The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

242. As alleged above, from October 2017 to December 2020, Roe substantially assisted Wiederhorn's scheme by, among other things, overseeing the FAT cash management team and directing to which of Wiederhorn's accounts to send FAT funds and effectuating many of the transfers himself. Despite being an executive officer of FAT, and knowing all the details about the Wiederhorn transfers and the Thayer Transactions, Roe did not inform the FAT Board when he knew, or was reckless in not knowing, that Wiederhorn misled them about how the proceeds of FAT's loans to FCCG were being used. Roe also reviewed, revised, and signed FAT's 2017 Form 10-K, thereby substantially assisting Wiederhorn in disseminating false and misleading statements which concealed Wiederhorn's scheme.

243. By engaging in the conduct described above, Defendant Roe knowingly and recklessly provided substantial assistance to, and thereby aided and abetted Wiederhorn in his violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] and Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

244. Unless restrained and enjoined, Roe is reasonably likely to continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)] and Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

///

## FOURTH CLAIM FOR RELIEF

**Materially False or Misleading Statements**

**in Connection With the Purchase or Sale of Securities**

**Violation of Section 10(b) and Rule 10b-5(b) Thereunder**

**(against Wiederhorn, FAT, Roe, and Hershinger)**

245.    The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

246.    As alleged above, among other filings, Wiederhorn made (1) affirmative false and misleading statements regarding related person transactions in connection with the Thayer Transactions in FAT's Forms 10-K for fiscal years 2017 through 2019; (2) affirmative false and misleading statements regarding related person transactions in connection with the Wiederhorn Personal Cash Transfers in FAT's Forms 10-K for fiscal years 2017 through 2020; and (3) affirmative false and misleading statements regarding the use of proceeds in FAT's Forms 10-K for fiscal years 2018, 2019, and 2020, and Forms 10-Q for Q1, Q2, and Q3 2029, and Q1, Q2, and Q3 2020.  Wiederhorn signed each of these company filings.

247.    As alleged above, Roe made affirmative false and misleading statements in FAT's 2017 Form 10-K regarding related person transactions in connection with the Thayer Transactions.  Roe signed this filing.

248.    As alleged above, Hershinger made affirmative false and misleading statements regarding related person transactions in connection with the Wiederhorn Personal Cash Transfers and Thayer Transactions in FAT's 2019 Form 10-K and its July 2020 Form S-1 Registration Statement that incorporated the relevant section of the 2019 Form 10-K by reference, and regarding the Wiederhorn Cash Transfers in FAT's 2020 Form 10-K.  Hershinger signed each of these filings.

249.    As set forth above, these affirmative false and misleading statements were material and made in connection with the purchase or sale of securities.

250.    Wiederhorn, Roe, and Hershinger made these statements with scienter

because they knew, or were reckless in not knowing, that the representations regarding related person transactions were false and misleading.

251.   Wiederhorn's, Roe's, and Hershinger's scienter is imputed to FAT, of which they were acting as its CEO or CFOs, respectively.

252.   By engaging in the conduct described above, Defendants Wiederhorn, Roe, Hershinger, and FAT directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.

253.   By engaging in the conduct described above, Defendants Wiederhorn, Roe, Hershinger, and FAT violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §§ 240.10b-5(b).

## FIFTH CLAIM FOR RELIEF

### Materially False or Misleading Statements
### in Connection With the Offer and Sale of Securities
### Violation of Section 17(a)(2) of the Securities Act
### (against FAT)

254.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

255.   As alleged above, among other filings, FAT's (1)  Forms 10-K for fiscal years 2017 through 2019 contained affirmative false and misleading statements regarding related person transactions in connection with the Thayer Transactions; (2) Forms 10-K for fiscal years 2017 through 2020 contained affirmative false and misleading statements regarding related person transactions in connection with the Wiederhorn Personal Cash Transfers; and (3) Forms 10-K for fiscal years 2018-2020

and Forms 10-Q for Q1-Q3 2019 and Q1-Q3 2020 contained affirmative false and misleading statements regarding the use of proceeds.

256.   These affirmative false and misleading statements were made or incorporated by reference in FAT's September 2019 Regulation A offering and July 2020 Form S-1 offering and were therefore in connection with the offer or sale of securities. Through these false and misleading statements, FAT received approximately $1,077,000 in proceeds through its September 2019 offering pursuant to Regulation A, and approximately $8,021,000 through its July 2020 offering pursuant to Form S-1.

257.   As set forth above, these false and misleading statements were material and made in connection with the offer or sale of securities.

258.   Wiederhorn signed each of these company filings.  Wiederhorn made these statements with scienter, or at least negligence, because he knew, or were reckless in not knowing, that the representations regarding related person transactions and use of proceeds were false and misleading.

259.   Hershinger signed the Company's July 2020 Form S-1 Registration Statement while knowing, being reckless in not knowing, or being at least negligent, that the Form S-1 contained materially false statements regarding related person transactions.

260.   Wiederhorn's and Hershinger's scienter and/or negligence are imputed to FAT, as they were acting as the Company's CEO and CFO, respectively.

261.   By engaging in the conduct described above, Defendant FAT directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

262.   By engaging in the conduct described above, Defendant FAT violated,

and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

## SIXTH CLAIM FOR RELIEF

**Aiding and Abetting FAT's Violation of Section 17(a)(2) of the Securities Act (against Wiederhorn and Hershinger)**

263. The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

264. As alleged above, Wiederhorn substantially assisted FAT's violation of Section 17(a)(2) by signing the Company's 2019 offering document pursuant to Regulation A and its July 2020 offering document pursuant to Form S-1 while knowing that the documents contained, or incorporated by reference, materially false and misleading statements regarding related person transactions and/or the use of proceeds.

265. As alleged above, Hershinger also substantially assisted FAT's violation of Section 17(a)(2) by signing the Company's July 2020 Form S-1 Registration Statement, while knowing, or being reckless in not knowing, that the Form S-1 contained materially false statements regarding related person transactions and/or the use of proceeds.

266. By engaging in the conduct described above, Defendants Wiederhorn and Hershinger knowingly or recklessly provided substantial assistance to, and thereby aided and abetted FAT in its violation of Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

267. By engaging in the conduct described above, Defendants Wiederhorn and Hershinger aided and abetted, and unless restrained and enjoined, is reasonably likely to continue to aid and abet, violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

///

///

## SEVENTH CLAIM FOR RELIEF

### False Statements to Accountants
### Violation of Rule 13b2-2 of the Exchange Act
### (against Wiederhorn, Roe, and Hershinger)

268.    The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

269.    As alleged above, Wiederhorn knowingly made false statements in the related party questionnaire he signed and provided to FAT's auditors in connection with the 2018 audit. In addition, Wiederhorn, Roe, and Hershinger all signed representation letters falsely stating that all information concerning related-party relationships had been disclosed despite knowing, or recklessly not knowing, about the Wiederhorn transfers or the Thayer Transactions, and, for Hershinger and Wiederhorn, the Wiederhorn Children salaries.

270.    Wiederhorn also knowingly (1) falsely told FAT's 2019 auditor that expenses Wiederhorn initially identified in as "AW personal" were instead FCCG business expenses; (2) falsely told FAT's 2019 auditor that FCCG used the loans from FAT to FCCG to pay legacy liabilities and business expenses; and (3) any payments by FAT of Wiederhorn's personal credit card charges were because the amounts due were business expenses of FCCG.

271.    As alleged above, Roe knowingly misled FAT's auditors in connection with the 2017 Company audit regarding the Thayer Transactions and Wiederhorn Personal Cash Transfers by identifying only FCCG as a related person to FAT in interviews.  In September and October 2020, Roe also made false representations to FCCG's auditors regarding documents which he misrepresented evidenced that FCCG's board of directors had fully approved loans from FCCG to Wiederhorn, which were never approved by the FCCG board.

272.    Hershinger knowingly told the auditors that the Wiederhorn Children Salaries had already been disclosed when, in fact, they had not.

273.   By engaging in the conduct described above, Defendants Wiederhorn, Roe, and Hershinger, directly or indirectly:  (1) made or caused to be made a materially false and misleading statement to an accountant in connection with:  (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the SEC; or (2) omitted to state, or caused another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:  (i) any audit, review or examination of the financial statements of the issuer required to be made under the federal securities laws; or (ii) the preparation or filing of any document or report required to be filed with the SEC.

274.   By engaging in the conduct described above, Defendants Wiederhorn, Roe, and Hershinger violated, and unless restrained and enjoined will continue to violate Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2.

## <u>EIGHTH CLAIM FOR RELIEF</u>

### False Sarbanes-Oxley Certification
### Violation of Rule 13a-14 of the Exchange Act
### (against Wiederhorn, Roe, and Hershinger)

275.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

276.   As alleged above, Wiederhorn, as the Chief Executive Officer of FAT, reviewed, approved, signed, and certified each of FAT's Forms 10-K for fiscal years 2017-2020 and each of FAT's Forms 10-Q for Q1-Q4 2019 and Q1-Q3 2020.  Roe, as the Chief Financial Officer of FAT, reviewed, approved, signed, and certified the FAT Form 10-K for fiscal year 2017.  Hershinger, as the Chief Financial Officer of FAT, reviewed, approved, signed, and certified the FAT Form 10-Ks for fiscal years 2018-2020.

277.   These certifications were false because these filings contained material misrepresentations and omissions about related person transactions and/or the use of proceeds.

278.   By engaging in the conduct described above, Defendants Wiederhorn, Roe, and Hershinger falsely certified periodic reports containing financial statements filed by an issuer in violation of Section 13(a) of the Exchange Act and Rule 13a-14 thereunder.

279.   By engaging in the conduct described above, Defendants Wiederhorn, Roe, and Hershinger violated, and unless restrained and enjoined will continue to violate, Rule 13a-14 of the Exchange Act, 17 C.F.R. § 240.13a-14.

<u>**NINTH CLAIM FOR RELIEF**</u>

**False SEC Filings**

**Violations of Section 13(a) of the Exchange Act and**

**Rules 12b-20, 13a-1 and 13a-13 Thereunder**

**(against FAT)**

280.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

281.   As alleged above *supra* in Section N of this Complaint, FAT, which was an issuer of securities registered pursuant to Section 12 of the Exchange Act, filed annual Forms 10-K and quarterly Forms 10-Q containing misrepresentations and omissions about related person transactions and/or the use of proceeds.

282.   By doing so, FAT filed materially false and misleading quarterly reports, and materially false and misleading annual reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13.

283.   By engaging in the conduct described above, Defendant FAT violated,

and unless restrained and enjoined will continue to violate, Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13.

## TENTH CLAIM FOR RELIEF

**Aiding and Abetting FAT's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 Thereunder**

**(against Wiederhorn)**

**Rules 12b-20 and 13a-1 Thereunder**

**(against Roe and Hershinger)**

284. The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

285. As alleged above, Wiederhorn, Roe, and Hershinger substantially assisted FAT's primary violations by signing certain Company filings during the Relevant Period. Wiederhorn signed FAT's Forms 10-K for fiscal years 2017-2020. Roe signed the 2017 Form 10-K, and Hershinger signed the Forms 10-K for fiscal years 2018, 2019, and 2020.

286. As alleged above, Wiederhorn signed each of FAT's Forms 10-Q for Q1-Q3 2019 and Q1-Q3 2020.

287. Each of the defendants knew or was reckless in not knowing that the filings they signed contained false and misleading statements about FAT's related person transactions and/or the use of proceeds.

288. By engaging in the conduct described above, Defendants Wiederhorn, Roe, and Hershinger each aided and abetted the reporting violations of FAT in that they knowingly or recklessly provided substantial assistance to FAT in committing these reporting violations.

289. By engaging in the conduct described above, Defendant Wiederhorn aided and abetted FAT's violations of, and, unless restrained and enjoined, will again aid and abet, violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

290.   By engaging in the conduct described above, Defendants Roe and Hershinger aided and abetted FAT's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder.

291.   Unless restrained and enjoined, Defendants Roe and Hershinger are reasonably likely to again aid and abet, violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-1 thereunder.

### ELEVENTH CLAIM FOR RELIEF

**Failure to Maintain Accurate Books and Records**

**Violation of 13(b)(2)(A) of the Exchange Act**

**(against FAT, and Wiederhorn, Roe, and Hershinger for Aiding and Abetting)**

292.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

293.   As alleged above, FAT failed to make and keep books and records that accurately reflected the reportable related person transactions and failed to track and report Wiederhorn's direct or indirect material interest in the loans from FAT to FCCG.

294.   As alleged above, Wiederhorn, Roe, and Hershinger aided and abetted FAT's violations by failing to maintain accurate books and records in tracking reportable related person transactions and failing to ensure that FAT's loans to FCCG were made with proper approvals.

295.   By the date of FAT's Form 2017 10-K, Wiederhorn knew or was reckless in not knowing that FAT had failed to track, report, and disclose reportable related person transactions relating to the Wiederhorn Personal Cash Transfers and the Thayer Transactions.  Wiederhorn substantially assisted FAT's violations by, among other things, signing director and officer questionnaires and a related party questionnaire that made false and misleading statements about reportable related person transactions that would have allowed FAT to accurately track and report such transactions.

296.   By the date of FAT's Form 2017 10-K, Roe knew that Wiederhorn was using most of the money FAT transferred to FCCG for the Wiederhorn Personal Cash Transfers and also knew that the Thayer Transactions amounted to over $120,000 for 2017.  Roe substantially assisted FAT's violations by, among other things, concealing the Wiederhorn Personal Cash Transfers and the Thayer Transactions as related party transactions during interviews with the auditors, as well as concealing the true purpose of those transactions.  In addition, Roe failed to disclose to auditors in management representation letters that the Wiederhorn Personal cash Transfers and the Thayer Transactions were related party transactions.

297.   By May 2019, Hershinger knew that Wiederhorn was using FAT's loans to FCCG on his personal expenses.  She substantially assisted FAT's violations by, among other things, accepting Wiederhorn's representations in his director and officer questionnaires for fiscal years 2019 and 2020 when she knew, or was reckless in not knowing, that those representations were false and misleading.

298.   By engaging in the conduct described above, FAT violated, and unless restrained and enjoined, will continue to violate Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

299.   By engaging in the conduct described above, Defendants Wiederhorn, Roe, and Hershinger knowingly and recklessly provided substantial assistance to, and thereby aided and abetted FAT in its violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

## TWELFTH CLAIM FOR RELIEF

### Failure to Devise a System of Internal Accounting Controls

### Violation of 13(b)(2)(B) of the Exchange Act

### (against FAT, and Wiederhorn, Roe, and Hershinger for Aiding and Abetting)

300.   The SEC realleges and incorporates by reference paragraphs 1 through

51

226 above.

301.   As alleged above, FAT failed to maintain a system of internal accounting controls sufficient to provide reasonable assurances that access to assets was consistent with management authorization.  The Company allowed Wiederhorn to have complete control over FAT's accounts and to direct the transfers to the cash team, often without Board authorization.

302.   Wiederhorn, Hershinger, and Roe aided and abetted FAT's violation by failing to devise and maintain an internal accounting control system to ensure FAT tracked reportable related person transactions and failing to ensure that FAT's loans to FCCG were made with proper approvals.

303.   Beginning in or around May 2019 until December 2020, Wiederhorn knowingly or recklessly misled the FAT Board by representing that the loans from FAT to FCCG were solely for FCCG's business expenses.  Wiederhorn also signed officer and director questionnaires that contained false and misleading statements about reportable related person transactions that would have allowed the Company to accurately track and report those transactions.

304.   Similarly, Roe and Hershinger knew or were reckless in not knowing that FAT failed to track, report, and disclose reportable related person transactions relating to Wiederhorn's ability to transfer money from FAT at his sole discretion and his concealment of the Wiederhorn Personal Cash Transfers from the FAT Board. For Roe, despite managing the FAT cash management team and his integral role in recording FAT's loans to FCCG, he failed to track, report, and disclose the Wiederhorn Personal Cash Transactions and Thayer Transactions.  Hershinger substantially assisted FAT's violations by accepting Wiederhorn's representations in his officer and director questionnaires for fiscal years 2019 and 2020 when she knew that they were false and misleading.  Moreover, despite knowing about the Wiederhorn Personal Cash Transfers and Thayer Transactions during this period, she failed to ensure that these transactions were tracked, reported and disclosed as

reportable related person transactions.

305.   By engaging in the conduct described above, FAT violated, and unless restrained and enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

306.   By engaging in the conduct described above, Defendants Wiederhorn, Hershinger, and Roe knowingly and recklessly provided substantial assistance to, and thereby aided and abetted FAT's violation of Section 13(b)(2)(B) of the Exchange Act, and unless restrained and enjoined, is reasonably likely to continue to aid and abet violations of Section 13(b)(2)(B) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(B).

### THIRTEENTH CLAIM FOR RELIEF
**Circumventing Internal Controls**
**Violation of Section 13(b)(5) of the Exchange Act**
**(against Wiederhorn)**

307.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

308.   As alleged above, Wiederhorn violated Section 13(b)(5) during the second, third, and fourth quarters of 2020.  In April 2020, after learning that Wiederhorn could lend FAT's money to FCCG "at no limit without board approval," FAT's Board put controls in place by requiring advance board approval for any additional lending by FAT to FCCG. Wiederhorn ignored and circumvented this control and continued to lend FAT money to FCCG in the second, third, and fourth quarters of 2020 in excess of the amounts approved by FAT's Board.

309.   As alleged above, Wiederhorn personally benefitted from this unauthorized lending through the Wiederhorn Personal Cash Transfers.

310.   By engaging in the conduct described above, Wiederhorn violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5).

53

## FOURTEENTH CLAIM FOR RELIEF

### Falsifying Books and Records

### Violation of Rule 13b2-1 of the Exchange Act

### (against Wiederhorn)

311.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

312.   As alleged above, Wiederhorn violated Rule 13b2-1 by signing director and officer questionnaires that made false and misleading statements about reportable related person transactions that would have allowed FAT to accurately track and report those transactions.

313.   By engaging in the conduct described above, Wiederhorn violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

## FIFTEENTH CLAIM FOR RELIEF

### Solicitation of Proxies in Violation of Rules and Regulations

### Violation of Section 14(a) of the Exchange Act and

### Rules 14a-3 and 14a-9 Thereunder

### (against FAT and Wiederhorn)

314.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

315.   As alleged above, FAT's proxy statements that it used to solicit proxies in connection with its 2018 through 2020 annual meetings for the election of directors, including Wiederhorn in 2020, contained false and misleading statements regarding FAT's reportable related person transactions with Wiederhorn and Thayer.

316.   In addition, FAT's proxy statements for 2018 and 2019, contained false and misleading statements regarding the Wiederhorn Personal Cash Transfers and Thayer Transactions, as well as the Wiederhorn Children Salaries.

317.   Wiederhorn signed these proxy statements despite knowing they

contained false and misleading statements.

318.   By engaging in this conduct, Wiederhorn acted at least negligently.

319.   As FAT's founder, CEO, and director, Wiederhorn is directly liable for FAT's proxy violations.

320.   By engaging in the conduct described above, Defendants FAT and Wiederhorn violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rules 14a-3and 14a-9 thereunder, 17 C.F.R. §§ 240.14a-3 and 14a-9.

## SIXTEENTH CLAIM FOR RELIEF

### Improper Personal Loans to FAT's CEO

### Violation of Section 13(k) of the Exchange Act

### (against FAT, and Wiederhorn and Roe For Aiding and Abetting)

321.   The SEC realleges and incorporates by reference paragraphs 1 through 226 above.

322.   As alleged above, from July 2018 to December 2020, Wiederhorn directed approximately $20 million from FAT to FCCG which were used for the Wiederhorn Personal Cash Transfers.  Wiederhorn used these funds to pay for private jets, first class airfare, luxury vacations, his rent and mortgage payments, shopping, and jewelry.

323.   The Wiederhorn Personal Cash Transfers were direct or indirect personal loans from FAT to Wiederhorn.

324.   Wiederhorn and Roe aided and abetted FAT's violation.  Wiederhorn directed FAT's cash team for each transaction between FAT and either FCCG or Wiederhorn that funded the Wiederhorn Personal Cash Transfers, and he knew that the transactions were for his personal benefit.  Roe similarly ensured Wiederhorn's instructions were followed and trained the FAT cash team on using the FAT loans to fund the Wiederhorn Personal Cash Transfers.

325.   By engaging in the conduct described above, FAT violated, and unless

restrained and enjoined will continue to violate, Section 13(k) of the Exchange Act, 15 U.S.C. § 78m(k).

326.   By engaging in the conduct described above, Defendants Wiederhorn and Roe knowingly and recklessly provided substantial assistance to, and thereby aided and abetted FAT's violation of Section 13(k) of the Exchange Act, and unless restrained and enjoined, are reasonably likely to continue to aid and abet violations of Section 13(k) of the Exchange Act, 15 U.S.C. § 78m(k).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining FAT and its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a)(2) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), 13(k), and 14(a) of the Exchange Act, and Rules 10b-5(b), 12b-20, 13a-1, 13a-13, 14a-3, and 14a-9 thereunder.

### **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Wiederhorn and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating 17(a)(1) and 17(a)(3) of the Securities Act, 10(b), 13(b)(5), and 14(a) of the Exchange Act, and Rules 10b-5, 13a-14, 13b2-1, 13b2-2, 14a-3 and 14a-9 thereunder; and aiding and abetting violations of

Securities Act Section 17(a)(2), Exchange Act Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(k) and Rules 12b-20, 13a-1, and 13a-13 thereunder.

**IV.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Roe and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act and Rules 10b-5(b), 13a-14, and 13b2-2 thereunder; aiding and abetting Wiederhorn's primary violations of Securities Act Sections 17(a)(1) and (3), and Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder; and aiding and abetting violations of Exchange Act Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), 13(k), and Rules 12b-20 and 13a-1 thereunder.

**V.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Hershinger and her officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act and Rules 10b-5(b), 13a-14, and 13b2-2 thereunder; and aiding and abetting violations of Section 17(a)(2) of the Securities Act and Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Rules 12b-20 and 13a-1 thereunder.

**VI.**

Issue an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Sections 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting Wiederhorn, Roe, and Hershinger from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the

Exchange Act, 15 U.S.C. § 78o(d).

## VII.

Order Defendants FAT and Wiederhorn to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

## VIII.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just and necessary.

## **Jury Demand**

The SEC demands trial by jury on liability.

Dated:  May 10, 2024

*/s/ Stephen T. Kam*
Stephen T. Kam
Robert C. Stillwell
Attorneys for Plaintiff
Securities and Exchange Commission